IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
SOUTHWESTERN DIVISION

| | |
|---|---|
| STEPHANIE TANNER, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 3:15-cv-05034-NKL |
| | ) |
| CAROLYN W. COLVIN, | ) |
| Acting Commissioner | ) |
| of Social Security | ) |
| | ) |
| Defendant. | ) |

**ORDER**

Before the Court is Plaintiff Stephanie Tanner's appeal of the Commissioner of Social Security's final decision denying her application for disability benefits under Title II of the Social Security Act. [Doc. 3]. For the following reasons, the Commissioner's decision is affirmed.

**I.  Background**

Plaintiff Stephanie Tanner was born on July 10, 1974. She completed some high school and has a GED. Tanner performed past work as a hospice caregiver, phone representative, and shipping clerk. She alleges an onset date of January 2, 2011, stemming from bipolar disorder, depression, anxiety, and PTSD combined with the stress of the hospice caregiving job, which she left for other reasons. *See* [Tr. 196-97].

**A.  Medical History**

1

Prior to Tanner's alleged onset date, the record shows she was treated for mental ailments on several occasions.[1] She sought treatment at Ozark Center in April 2007, where Tanner reported poor appetite, lethargy, persistent sleeping problems, some hallucinations and paranoia, and suicidal thoughts. [Tr. 306]. Treatment notes describe Tanner as irritated, frustrated, frequently distracted, and severely depressed. *Id*. They further observe, however, that Tanner was alert, goal-oriented, and cognitively and intellectually intact during the visit. *Id*. Tanner was prescribed Wellbutrin and trazedone at that time. [Tr. 307].

In 2010, Tanner saw Cynthia Voegeli, a nurse practitioner, at Riverstone Community Clinic. Tanner complained of fatigue, anxiety, and decreased appetite. [Tr. 282]. Voegeli noted that Tanner was prone to crying spells but displayed a stable mood, lacked suicidal thoughts, and did not exhibit psychotic patterns. [Tr. 287, 291]. Over the course of her visits, Voegeli observed improvements in Tanner's mood and anxiety levels. [Tr. 287, 289, 290]. She prescribed Lamictal and lorazepam. [Tr. 290]. In June 2010, Voegeli noted that the Lamictal was helping Tanner's stress levels and that the lorazepam dose should be decreased. *Id*. In September 2010, Voegeli reported that Tanner had stopped taking the Lamictal but was still taking Ativan to control her mood and Ambien to help her sleep. [Tr. 287].

On January 10, 2011, a week after her alleged onset date, Tanner presented to Barbara Bryson, a nurse practitioner. Bryson noted complaints of fatigue and decreased appetite. She opined that Tanner's appetite changes may be related to the pain medication she was taking. [Tr. 282]. Bryson prescribed Lexapro, *id*., but Tanner was disinclined to take the medication, [Tr. 275].

---

[1] The record also details Tanner's medical history of physical impairments. Because she does not challenge the ALJ's decision regarding any physical impairment, however, the Court does not address this component of the record on appeal.

2

On January 18, 2011, Tanner was admitted to Sacred Heart Medical Center to undergo a laparoscopy. As part of her evaluation, Dr. Linda Frison noted weight loss, insomnia, anxiety, depression, and a family history of depression. [Tr. 274]. Dr. Frison observed that Tanner conversed easily and presented well. *Id*.

In 2012, Tanner received treatment for anxiety and insomnia at the Missouri Southern State University Health Clinic. Tanner, who was noted as tearful, sought pain medication that the health center could not provide. She was instead prescribed Ambien, Lamictal, and sertraline. [Tr. 315].

In July 2012, two doctors evaluated Tanner at the request of Disability Determinations. First, Dr. Kevin Whisman performed a psychological consultative examination on July 18, 2012. At the evaluation Tanner reported anxiety, fear, paranoia, bipolar disorder, and PTSD. Tanner described childhood traumas, including a history of family dysfunction and sexual abuse that were contributing to her anxiety and sleep problems. [Tr. 319]. Dr. Whisman observed that Tanner was tearful and dysphoric but also goal-oriented. [Tr. 318]. He assessed a GAF score of 50 and opined that, while Tanner was socially limited, she could concentrate and understand instructions. *Id*. He further opined that her functioning, memory, and abstract thinking were within the normal range, and that her mental control was adequate. [Tr. 320]. Dr. Whisman diagnosed Tanner with panic disorder and depressive disorder. [Tr. 321]. He concluded that Tanner could operate in a socially-restrictive environment. *Id*.

Dr. William Hughes also performed a psychological consultative examination and also noted that Tanner appeared depressed and anxious, with an impression of PTSD and unspecified bipolar disorder. [Tr. 329].

Tanner's records, including the records from these exams, were analyzed on August 8, 2012 by C. Kenneth Bowles, Ph.D., a state consultant. Dr. Bowles concluded that Tanner was not limited in memory, concentration, asking simple questions, requesting assistance, or understanding instructions. [Tr. 98]. He opined, however, that Tanner had moderate limitations in her social functioning and her capacity to respond to changes in the work setting. [Tr. 99]. Like Dr. Whisman, Dr. Bowles concluded that Tanner could perform most tasks in a socially-restrictive environment. [Tr. 95].

In October 2012, Tanner began therapy with John Graue, M.S., Th.D., a licensed psychologist. Over the course of eleven sessions, Tanner reported anxiety, panic, depression, social mistrust, lack of appetite, and difficulty sleeping. Tanner and Dr. Graue discussed her family history and childhood trauma, including Tanner's account of being raped by a childhood friend, dating a boyfriend who was murdered, living with violent parents who abused alcohol and drugs, and dealing with a teenage pregnancy. [Tr. 356]. Tanner and Dr. Graue also discussed Tanner's recent stresses stemming from her experience as a hospice worker and from the challenge of caring for her disabled husband. *Id*. Based on these conversations, Dr. Graue assessed a GAF score of 40 and diagnosed Tanner with bipolar disorder, PTSD, social anxiety disorder, and panic disorder. His treatment notes further indicate that Tanner had symptoms of hallucinations, nightmares, and panic attacks. [Tr. 348, 349, 355]. Over the course of the sessions, however, Mr. Graue noted that Tanner's mental state was improving, her mental symptoms were stabilizing, and her medication appeared effective. *See* [Tr. 343-46, 354-55].

Dr. Graue completed a Medical Source Statement on August 7, 2013. He opined that Tanner had moderate to marked limitations in nine areas of mental functioning. [Tr. 362]. He further opined that Tanner was "extremely limited" in ten areas of mental functioning: her ability

4

to understand and remember detailed instructions, carry out detailed instructions, maintain attention and concentration for extended periods, perform activities within a schedule, sustain an ordinary routine without special supervision, work in coordination with or proximity to others without distraction, complete a normal workday without interruption, accept instructions and respond appropriately to criticism from supervisors, get along with coworkers or peers without distracting them or exhibiting behavioral extremes, and respond appropriately to changes in the work setting. [Tr. 363].

Tanner was then examined by Kenneth C. Stewart, D.O., on February 13, 2013. Stewart opined that Tanner had normal mood, affect, behavior, judgment, and thought content. [Tr. 368].

Tanner presented to Pamela Lynne Faille, a nurse practitioner, on July 16, 2013. She reported anxiety and depression, which she stated had worsened since her youngest son had moved out of the home. [Tr. 380]. Faille noted that Tanner was doing well on a Seroquel prescription and that both her depression and anxiety appeared stable. Fille observed normal appearance, speech, thought processes, and associations. *Id*. She concluded that Tanner was depressed but lacked suicidal thoughts, hallucinations, and obsessions. [Tr. 381].

At the time of her hearing, Tanner lived with her disabled husband in Granby, Missouri. She had not looked for work since 2010, when she moved from Oregon to Missouri. [Tr. 67]. Tanner testified that she had a driver's license and was able to drive normally, and that she began taking college classes after moving from Oregon. [Tr. 70]. However, she had trouble interacting with the other students and dropped one of her classes, which caused her to lose her tuition grant. [Tr. 70, 77]. Tanner described an event where she felt rage towards another student. [Tr. 73]. She also stated, more generally, that she finds herself mistrustful and anxious around other

5

people, leading her occasionally to act out in anger because she believes everyone is against her. [Tr. 77-78].

Tanner testified that her anxieties worsened following her job as a hospice worker, where she had to care for dying patients; after her youngest son moved out of the home, which removed the purpose and distraction of raising children; and after she began revisiting traumatic episodes from her past in therapy sessions with Dr. Graue. [Tr. 67, 74, 75]. Tanner recounted these traumatic past episodes, including childhood rapes and other abuses, which, she testified, were contributing to her stress levels and social fears at the time of the hearing. [Tr. 69, 73].

As consequence of these triggers, Tanner further testified that she was unable to handle stress and thus limited in her performance of regular activities. She stated that she spends most time in her home and away from other people. [Tr. 74]. Tanner testified that she was sleeping often during the day and unmotivated to leave her room. [Tr. 69, 74]. She also stated that she regularly has conflicts with other people and fears she will attack others when she is angry. [Tr. 77].

Tanner testified that she was taking Seroquel, Effexor, and Ambien. [Tr. 70]. Although she was experiencing side effects from her medications, she also reported that they were helping her symptoms. [Tr. 80].

### B. ALJ's Decision

After hearing, the ALJ issued a decision on October 11, 2013. He found that Tanner suffered from the following severe impairments: major depression, bipolar affective disorder, anxiety disorder with agoraphobia, and personality disorder. [Tr. 17]. Relying on the testimony of a vocational expert, the ALJ concluded that Tanner is unable to perform past relevant work

6

Case 3:15-cv-05034-NKL   Document 12   Filed 12/01/15   Page 6 of 18

but, considering her age, education, experience, and limitations, Tanner could find other jobs that exist in significant numbers in the national economy. [Tr. 25].

As part of this analysis, the ALJ assessed Tanner's RFC as follows:

> [Tanner] has the residual functional capacity to perform a full range of work at all exertional levels, but would have certain non-exertional limitations. Specifically, [Tanner] can perform simple, unskilled work involving routine, repetitive tasks. She can tolerate occasional interaction with supervisors and co-workers, but no interaction with members of the general public. She can perform simple, work-related decision-making, but no complex planning or negotiation, and she can tolerate minor, infrequent changes within the workplace.

[Tr. 20].

The ALJ reached this RFC by giving "significant weight" to Dr. Whisman and Dr. Bowles' opinions. [Tr. 24]. He gave "minimal weight" to Dr. Graue's opinion that Tanner had extreme limitations in most areas of functioning. [Tr. 23-24]. And he found that the medical record supported, to a degree, Tanner's allegation that stress and social anxieties interfered with her life. But he concluded that "[Tanner's] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible." [Tr. 21].

In discounting Dr. Graue's opinion that Tanner was extremely limited in her ability to pay attention, the ALJ remarked that this conclusion is inconsistent with Tanner's ability to drive a car. [Tr. 23]. In response to Dr. Graue's opinion that Tanner was extremely limited in her ability to maintain attendance, accept instructions, and respond appropriately to supervisors, the ALJ noted that Dr. Graue does not explain this conclusion, which lacks support in the medical record. *Id.* And in response to Dr. Graue's opinion that Tanner was markedly limited in her ability to ask simple questions, the ALJ described this conclusion as "palpably absurd" and also not supported in the medical record. *Id.*

Addressing Dr. Graue's opinion more generally, the ALJ wrote that Tanner "has appeared remarkably symptom free in other medical settings not involving Dr. Graue." *Id*. He pointed out that Tanner was found to have normal mood and affect in several other treatment contexts. [Tr. 24]. He also noted that Tanner's life activities did not indicate extreme limitations because she cared for her husband, attended college classes, and carried out many other daily activities. The ALJ finally remarked that Dr. Graue's terminal degree was in theology rather than psychology. *Id*.

In discounting Tanner's credibility, the ALJ mentioned the factors listed under 20 C.F.R. § 416.929(c) and then referenced his analysis elsewhere in the opinion.

## II. Discussion

Tanner argues that the Commissioner's decision is not supported by substantial evidence in the record as a whole. Tanner first maintains that the ALJ erred by discounting Dr. Graue's opinion, despite his status as a treating source, and according more weight to the opinion of Dr. Whisman, who only examined Tanner once. Second, Tanner argues that the ALJ improperly discounted her testimony of her own limitations. Because the ALJ only referenced the criteria for a credibility assessment and then only referenced other evidence discussed in his opinion, Tanner contends that he did not adequately consider her credibility before discounting it.

The dispositive questions before the Court, therefore, are (1) whether the ALJ's decision to discount Dr. Graue's opinion is supported by substantial evidence in the record as a whole and (2) whether the ALJ conducted a proper credibility assessment before discounting Tanner's credibility.

### A. Weight Given to Dr. Graue's Opinion

Dr. Graue was a "treating source" for Tanner, as defined in 20 C.F.R. § 404.1502, because the two had an ongoing treatment relationship. As a treating source, Dr. Graue's opinion is entitled "controlling weight" and must be adopted by an ALJ if it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record." *Singh v. Apfel*, 222 F.3d 448, 452 (8th Cir. 2000). *See also Wagner v. Astrue*, 499 F.3d 842, 848–49 (8th Cir. 2007).

If it is not given controlling weight, a treating source's opinion "is generally entitled to substantial weight," *Kelley v. Callahan*, 133 F.3d 583, 589 (8th Cir. 1998), in which case an ALJ will apply the factors listed in 20 C.F.R. § 404.1527(c) to determine how much weight to accord. Such factors include the "supportability" of the source's opinion by other evidence, 20 C.F.R. § 404.1527(c)(2)(3), and the opinion's "consistency" with that evidence, 20 C.F.R. § 404.1527(c)(2)(4). In other words, the ALJ may "discount or even disregard the opinion of a treating source where other medical assessments are supported by better or more thorough medical evidence, or where a treating source renders inconsistent opinions that undermine the credibility of such opinions." *Miller v. Colvin*, 784 F.3d 472, 477 (8th Cir. 2015) (*citing Prosch v. Apfel*, 201 F.3d 1010, 1013 (8th Cir. 2000)). Yet the ALJ must always offer "good reasons" for doing so. 20 C.F.R. § 404.1527(d)(2). *See also Brown v. Astrue*, 611 F.3d 941, 951 (8th Cir. 2010).

Tanner argues that the ALJ did not, and cannot, show that Graue's opinion is inconsistent with the record. Specifically, Tanner disputes the ALJ's conclusion that the record does not support Graue's opinion that Tanner has significant limitations paying attention, accepting instructions, listening to supervisors, and asking simple questions. Tanner contends that these limitations are all demonstrated in the record. Tanner also challenges the ALJ's observation that

9

she appeared symptom-free in other treatment contexts and that her daily activities undermine Dr. Graue's opinion. Here too, Tanner contends that the record demonstrates otherwise.

A court reviewing an ALJ's decision may not reweigh the evidence to decide whether a claimant's arguments have support in the record. *Wiese v. Astrue*, 552 F.3d 728, 730 (8th Cir. 2009) (*citing Loving v. Dep't of Health and Human Servs., Sec'y*, 16 F.3d 967, 969 (8th Cir. 1994)). Rather, the court must only determine whether substantial evidence exists to support the reasons cited by the ALJ for his conclusion. *See Mapes v. Chater*, 82 F.3d 259, 262 (8th Cir. 1996) ("If, after review, [the court] find[s] it possible to draw two inconsistent positions from the evidence and one of those positions represents the [ALJ's] findings, we must affirm the denial of benefits.").

In reviewing Tanner's medical record, the Court finds substantial evidence to support the ALJ's assessment of Dr. Graue. Dr. Graue's opinion, as the ALJ noted, was consistent with those of other medical professionals who examined Tanner and determined that she suffered from mental impairments such as depression, PTSD, and anxiety disorder. *See* [Tr. 274, 282, 306, 318, 319, 329, 381]. Dr. Graue's notes are particularly consistent with respect to Tanner's childhood trauma, which appears throughout Tanner's medical record as a significant factor behind Tanner's stress, social anxiety, and insomnia. *See* [Tr. 319, 326, 366, 380].

Yet Dr. Graue's opinion as to the extremity of these impairments is inconsistent with substantial evidence elsewhere in the record. Dr. Whisman, for example, explored Tanner's medical history and performed several cognitive tests during her exam, and from these he concluded that Tanner was capable of concentrating and understanding instructions. [Tr. 318]. Pamela Faille found Tanner depressed and anxious, but believed Tanner's condition was "stable" as to both of these aliments. [Tr. 381]. Faille further found normal thought processes and intact

10

associations. [Tr. 380]. Cynthia Voegeli, meanwhile, also observed that Tanner was depressed and anxious, but noted that her mental state was stable and improving over the course of the visits. In June 2010, Tanner was in "[n]o apparent distress," in July she was "less stressed [] and less anxious," and at Tanner's last appointment "[h]er mood [was] stable" and her appearance "appropriate." [Tr. 287-90]. Barbara Bryson similarly determined that Tanner presented with anxiety and fatigue, but remarked that Tanner's appetite problems may be caused by her medications and switched her from lorazepam to a starting dose of Lexapro. [Tr. 282]. Dr. Linda Frison also opined that Tanner had depression and anxiety, but noted that Tanner "converse[d] easily" and presented as "healthy and well." [Tr. 275]. Finally, when Tanner presented at Mercy Hospital of Joplin in February 2013, complaining of abdominal pain following a recent laparoscopy, the attending noted a history of PTSD and social anxiety but found Tanner to have normal mood, affect, behavior, judgment, and thought content. [Tr. 366, 368].

The bulk of Tanner's medical records therefore paint a consistent picture. In each patient assessment, the medical professional noted or observed Tanner's mental impairments. But in each assessment, with the exception of Dr. Graue's opinion, Tanner's impairments are not described as severely limiting. Rather, she is depicted as having appropriate presentation, holding comfortable conversation, and displaying a stable mood. The Court thus cannot say the ALJ's decision falls outside the range of permissible conclusions he could draw from the record. *See Buckner v. Astrue*, 646 F.3d 549, 556 (8th Cir. 2011) ("We will not disturb the denial of benefits so long as the ALJ's decision falls within the available zone of choice.").

Similarly, there is substantial evidence to support the ALJ's finding that Tanner's daily activities are inconsistent with Dr. Graue's opinion. Tanner points out that she was only able to

11

take two college classes, causing her to lose her tuition grant, and that she struggled to perform everyday activities such as showering, cooking, and interacting with people outside of her home. However, the ALJ remarked that Tanner "continues to be able to be able to provide care for her disabled husband[,] . . . carry on many daily activities[,] . . . follow questions and respond rationally at her disability hearing[, and] . . . attend university classes." [Tr. 24]. These findings are reflected in the record. *See* [Tr. 216] (Tanner reporting that she provides some care for her husband); [Tr. 217-19] (reporting that she drives, does laundry, shops, and gardens); [Tr. 220] (reporting she can follow simple instructions); [Tr. 77] (testifying that she could handle two classes, but not more than two classes, at Missouri Southern University). While Tanner argues that the record still paints a more nuanced picture than the ALJ's opinion indicates, the fact that some evidence may cut against the ALJ's finding does not mandate reversal. *Mitchell v. Shalala*, 25 F.3d 712, 714 (8th Cir. 1994) ("[A court] will not reverse a decision simply because some evidence may support the opposite conclusion.").

Finally, the ALJ discounted Dr. Graue's opinion because "Dr. Graue[] fail[ed] to explain [his] finding of 10 out of 20 functions to be extremely limited." [Tr. 24]. The ALJ, in doing so, was referencing Dr. Graue's Medical Source Statement, where he checked boxes to indicate these limitations but did not otherwise explain them. [Tr. 362-63]. Dr. Graue also provided a psychological evaluation report, where he found "strong evidence of multiple types of abuses" in Tanner's past, and a diagnostic assessment, where he opined that Tanner suffered from PTSD, insomnia, and social anxiety, but noted that she was psychologically oriented, lacked evidence of psychotic processes, demonstrated appropriate associations, and displayed good grooming and hygiene. [Tr. 353, 356].

12

Dr. Graue's treatment notes similarly indicate that Tanner suffered from mental impairments, particularly PTSD, but demonstrate that she improved over the course of her sessions. On March 4, 2013, Dr. Graue wrote that Tanner was "stable" and "becoming more resourceful." [Tr. 350]. On May 23, Tanner was "opening up well [and] support [was] developing." [Tr. 346]. On June 13, Tanner was "currently stable," and then on July 25 she was "fairly stable." [Tr. 343-45]. Dr. Graue also noted that Tanner was making progress without medication, but that her anti-anxiety prescription was helpful when she took it. [Tr. 354-55].

As such, apart from the checklist he completed for Tanner's Medical Source Statement, Dr. Graue did not explain why Tanner has significant limitations paying attention, accepting instructions, listening to supervisors, and asking simple questions. The checklist, furthermore, is conclusory because it also does not explain how Dr. Graue arrived at his conclusions. *Wildman v. Astrue*, 596 F.3d 959, 964 (8th Cir. 2010) (finding checklist forms to be conclusory evidence). *See also Holmstrom v. Massanari*, 270 F.3d 715, 721 (8th Cir. 2001) (noting that "[t]he checklist format . . . limit[s] [an opinion's] evidentiary value").

Along these lines, the Eighth Circuit has remarked that "[a] treating physician's opinion deserves no greater respect than any other physician's opinion when [it] consists of nothing more than vague, conclusory statements." *Piepgras v. Chater*, 76 F.3d 233, 236 (8th Cir. 1996). In *Piepgras*, a treating physician opined that the claimant, a diabetic, could not hold a job because his sugar levels affected his stamina, vision, motor ability, and ability to understand basic instructions. The ALJ did not reject this opinion outright, but he discounted the physician's conclusion as to the intensity of the diabetes. The Eighth Circuit affirmed. It observed that the treating physician "provided no explanation as to how [the claimant's] blood sugar levels affected his abilities." *Id*. In Tanner's case as well, the ALJ did not reject Dr. Graue's opinion

13

outright; he merely discounted this opinion to the extent it makes conclusions about the intensity of Tanner's ailments absent support or explanation.

The Court thus cannot say the ALJ erred in reaching this outcome.

### B. Tanner's Credibility

Tanner also challenges the ALJ's credibility findings. She argues that the ALJ improperly discounted her testimony that her mental impairments are so pronounced that she often feels too anxious to leave her room, experiences rage and crippling fears in outside society, and cannot, as a result, hold a regular job.

A court generally will not disturb an ALJ's credibility determinations. *Pearsall v. Massanari*, 274 F.3d 1211, 1218 (8th Cir. 2001) ("The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts."). As such, "[i]f an ALJ explicitly discredits a claimant's testimony and gives a good reason for doing so, [a court] will normally defer to that judgment" as well. *Dixon v. Sullivan*, 905 F.2d 237, 238 (8th Cir. 1990).

In the ALJ's first mention of Tanner's credibility, he wrote: "[a]fter careful consideration of the evidence, the undersigned finds that [Tanner's] medically determinable impairments could possibly be expected to cause to some degree the symptoms alleged; however, [Tanner's] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision." [Tr. 21]. Later in the opinion, the ALJ listed the credibility factors set forth in 20 C.F.R. § 416.929(c) and concluded that, "as discussed in the analysis above, the evidence does not support the severity or frequency of symptoms that [Tanner] now alleges." [Tr. 23].

In finding Tanner had a severe mental impairment, the ALJ found she had a mild restriction in activities of daily living. [Tr. 19]. Tanner reported some difficulty with personal

14

care such as neglecting to bathe, and she reported anxiety and panic issues. [Tr. 19, 216, 224]. Notably, however, Tanner provided care for her husband, who was disabled with a broken back. [Tr. 19, 197]. She also watered her outdoor flowers, hung her laundry, drove, shopped, prepared simple meals, watched television, used the computer, and managed her money. [Tr. 19, 217-19]. There is substantial evidence in the record to support the ALJ's finding that Tanner's daily activities indicated her impairments were not as severe as alleged. [Tr. 19]. *See Davis v. Apfel*, 239 F.3d 962, 967 (8th Cir. 2001) (*citing Benskin v. Bowen*, 830 F.2d 878, 883 (8th Cir. 1987)) ("Allegations of pain may be discredited by evidence of daily activities inconsistent with such allegations.").

In addition, as the ALJ recognized, Tanner testified that she stopped working in 2010 because she moved, and not because of any alleged impairment. [Tr. 21, 66-67]. Tanner also submitted medical records dating back to 2007, which shows that her mental symptoms were longstanding, and that she worked for at least three years despite her alleged impairments. [Tr. 230, 305-06]. *See Medhaug v. Astrue*, 578 F.3d 805, 816-17 (8th Cir. 2009) (holding that the fact that a claimant left a job for reasons other than his medical condition is a proper credibility consideration); *Orrick v. Sullivan*, 966 F.2d 368, 370 (8th Cir. 1992) (holding that where a claimant has worked with an impairment over a period of years, it cannot be considered disabling at present without showing that there has been a significant deterioration in that impairment).

The ALJ found moderate limitations in social functioning. There is substantial evidence to support this finding including Tanner's testimony about road rage, impaired emotions, being afraid of others, isolating herself, experiencing difficulties with stress, and suffering from PTSD. [Tr. 19, 21, 68, 218, 221, 356]. The ALJ also mentioned Dr. Whisman's observation of intermittent eye contact, crying, and over-elaborative speech. [Tr. 19, 318-19]. However,

15

Tanner went out in public, shopped, and took college courses. [Tr. 19, 70, 218]. This evidence supports the ALJ's finding that her description of her disability was not as severe as alleged.

In further analyzing Tanner's mental impairments, the ALJ cited evidence showing her condition improved with medication, as well as evidence that Tanner reported fewer crying episodes, less anxiety, and feeling well. [Tr. 21-22, 80, 289-290, 349, 354, 380]. Further, other than two July 2012 consultative examinations in connection with this claim, Tanner's lack of mental health treatment from May 2012 through October 2012 indicates her symptoms were not as severe as she described in her testimony. [Tr. 315-16, 318-322, 326-331, 356-57]. *See Medhaug*, 578 F.3d at 813 (*quoting Estes v. Barnhart*, 275 F.3d 722, 725 (8th Cir. 2002)) ("An impairment which can be controlled by treatment or medication is not considered disabling."); *Roberts v. Apfel*, 222 F.3d 466, 469 (8th Cir. 2000) (citation omitted) ("The absence of any evidence of ongoing counseling or psychiatric treatment or of deterioration or change in [a claimant's] mental capabilities disfavors a finding of disability.")

This record overall does not support Tanner's allegations of disabling symptoms. For example, during her examination with Dr. Whisman, Tanner's speech was goal-directed and relevant, she displayed no evidence of psychomotor agitation, and there was no evidence of a thought disorder. [Tr. 22, 318]. Further, her remote memory was normal, she had adequate mental control, and her memory was normal. [Tr. 321]. Dr. Whisman found Tanner could understand and remember instructions in most tasks and sustain concentration and persistence (Tr. 22, 321). Tanner's mood, affect, behavior judgment, and thought content were normal in January 2013, and she had no confusion or agitation in February 2013. [Tr. 366, 368]. Likewise, in July 2013, Ms. Fille observed normal speech, normal thought process, and fair insight and judgment in concluding Plaintiff's depression and anxiety were stable. [Tr. 380-81].

16

Further, Ms. Fille spent most of Plaintiff's visit discussing "empty nest syndrome." [Tr. 380-81]. The ALJ acknowledged instances where Tanner was tearful or had depressed mood, but the ALJ properly considered the entire record and concluded that it failed to support Tanner's allegations of total disability based on her mental impairments. [Tr. 19-24, 318-19, 380-81].

The ALJ referenced the *Polaski* factors [Tr. 17-24], but Tanner argues that the ALJ did not discuss "many" of them and instead relied solely on the medical evidence in finding Plaintiff was not credible. [Doc. 10, p. 18]. The Eighth Circuit has clearly held, however, that the ALJ is not required to discuss every *Polaski* factor. Here, the ALJ discussed Plaintiff's daily activities, her testimony regarding her alleged impairments, her medications, treatment, and all of the factors described above in analyzing her credibility. [Tr. 17-24]. *See Eichelberger v. Barnhart*, 390 F.3d 584, 590 (8th Cir. 2004) ("[T]he ALJ need not explicitly discuss each *Polaski* factor. The ALJ only need acknowledge and consider those factors before discounting a claimant's subjective complaints.") (internal citation omitted); *Goff v. Barnhart*, 421 F.3d 785, 791 (8th Cir. 2005) (rejecting the argument that "the ALJ was required to make an express credibility finding on each of the *Polaski* factors.").

Finally, as discussed above, the ALJ considered the medical opinion evidence as to Tanner's mental impairments and there is substantial evidence to support his decision to give minimal weight to the opinion of Dr. Graue and significant weight to the opinion of Dr. Whisman. [Tr. 23-24].

While the Court cannot say that the ALJ thoroughly discussed his credibility conclusion, he has provided sufficient analysis in the record as a whole that the Court can clearly understand the basis for his decision to discount Tanner's testimony concerning her limitations. Furthermore, there is substantial evidence to support his finding.

17

## III. Conclusion

For the foregoing reasons, the Commissioner's decision is affirmed.

s/ Nanette K. Laughrey  
NANETTE K. LAUGHREY  
United States District Judge

Dated: December 1, 2015  
Jefferson City, Missouri